# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GALLATIN POWER PARTNERS, LLC, a Montana Limited Liability Company, <br><br>        Plaintiff, <br><br> v. <br><br> PINE GATE RENEWABLES, LLC, a North Carolina Limited Liability Company; PINE GATE DEVELOPMENT, LLC, a North Carolina Limited Liability Company; SUNSTONE SOLAR, LLC, an Oregon Limited Liability Company; SUNSTONE SOLAR 1, LLC, an Oregon Limited Liability Company; SUNSTONE SOLAR 2, LLC, an Oregon Limited Liability Company; SUNSTONE SOLAR 3, LLC, an Oregon Limited Liability Company; SUNSTONE SOLAR 4, LLC, an Oregon Limited Liability Company; SUNSTONE SOLAR 5, LLC, an Oregon Limited Liability Company; SUNSTONE SOLAR 6, LLC, an Oregon Limited Liability Company; FP 2021 DEVCO HOLDCO, LLC, a _ Limited Liability Company; and DOES 1 through 10, <br><br>        Defendants. | Case No.: 1:25-cv-08946 |

## COMPLAINT

PARSONS BEHLE & LATIMER
Brian M. Rothschild (motion *pro hac vice* forthcoming)
Alissa M. Mellem (motion *pro hac vice* forthcoming)
Jordan N. Anderson (NY Bar No. 5781836)
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
brothschild@parsonsbehle.com
amellem@parsonsbehle.com
janderson@parsonsbehle.com

Dated: October 28, 2025

**Nature of Action**

1.     This is an action for declaratory relief and recovery of property that is beneficially owned by Plaintiff Gallatin Power Partners LLC ("**Gallatin**" or "**Plaintiff**").  Gallatin developed the initial stages of a solar power project (the "**Project**") and partnered with Defendant Pine Gate Renewables, LLC ("**Pine Gate Renewables**") to complete the later stages of the Project.  Under their agreements, Pine Gate Renewables took title to the Project and was required to continue to work with Gallatin to develop the Project, but, if Pine Gate Renewables failed to meet certain milestones, it was required to transfer title to the Project back to Gallatin.

2.     Pine Gate Renewables missed the milestones and now has publicly announced that it is insolvent.  Instead of reconveying the Project to Gallatin as agreed, Pine Gate Renewables transferred key assets in the Project to non-signatory subsidiaries and encumbered the Project's assets, eliding its obligations to Plaintiff to transfer the Project back.  Pine Gate Renewables and its transferees (collectively, "**Defendants**") have not only deprived Plaintiff from realizing the benefit of its bargain with Pine Gate Renewables but have placed the entire Project at risk.  The milestones in the agreements are not arbitrary, and failure to meet them will result in irreparable harm including the forfeiture of government subsidies and rights under third-party contracts with utilities.

3.     Absent judicial intervention and relief in favor of Plaintiff, the Project stands to become a complete and utter failure – depriving the Pacific Northwest of the United States of energy it desperately needs.  The Project and, consequently Gallatin, will suffer irreparable harm if the Project is not immediately returned as required under the agreements.

4.     Plaintiff has no alternative but to bring this action to obtain necessary legal and equitable relief to save itself and the Project from complete disaster.

**Parties**

5.    Plaintiff Gallatin Power Partners, LLC ("**Gallatin**" or "**Plaintiff**") is a Montana limited liability company with its principal place of business in Bozeman, Montana.

6.    Defendant Pine Gate Renewables, LLC ("**Pine Gate Renewables**") is a North Carolina limited liability company with its principal place of business in Asheville, North Carolina.

7.    Defendant Pine Gate Development, LLC ("**Pine Gate Development**") is a North Carolina limited liability company with its principal place of business in Asheville, North Carolina.

8.    Upon information and belief, Pine Gate Development is a wholly owned subsidiary of and/or managed by Pine Gate Renewables.

9.    Defendant FP 2021 Dev Holdco, LLC ("**FP 2021**") is a North Carolina limited liability company with its principal place of business in Asheville, North Carolina.

10.    Upon information and belief, FP 2021 is a wholly owned subsidiary of and/or managed by Pine Gate Development.

11.    Defendant Sunstone Solar, LLC ("**Sunstone Solar**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

12.    Defendant Sunstone Solar 1, LLC ("**Sunstone 1**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

13.    Defendant Sunstone Solar 2, LLC ("**Sunstone 2**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

14.    Defendant Sunstone Solar 3, LLC ("**Sunstone 3**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

15.    Defendant Sunstone Solar 4, LLC ("**Sunstone 4**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

16.     Defendant Sunstone Solar 5, LLC ("**Sunstone 5**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

17.     Defendant Sunstone Solar 6, LLC ("**Sunstone 6**") is an Oregon limited liability company with its principal place of business in Asheville, North Carolina.

18.     Throughout this Complaint, Sunstone 1, Sunstone 2, Sunstone 3, Sunstone 4, Sunstone 5, and Sunstone 6 are referred to collectively as the "**Sunstone Subsidiaries**."

19.     Upon information and belief, the Sunstone Subsidiaries are each a wholly owned subsidiary of and/or managed by FP 2021.

20.     Upon information and belief, the Sunstone Subsidiaries each share the same principal address in Asheville, North Carolina, as Pine Gate Renewables, Sunstone SolarPine Gate Development, and FP 2021.

**Jurisdiction and Venue**

21.     Plaintiff and Pine Gate Renewables were parties and signatories to that certain Membership Interest Purchase and Sale Agreement dated August 18, 2021 ("**MIPA**").

22.     The MIPA expressly provided that New York law would govern any claim or dispute arising therefrom and that any action arising out of or based upon the MIPA shall be instituted in this Court or the courts of the State of New York in Manhattan, New York.

23.     Pursuant to the MIPA, both Plaintiff and Pine Gate Renewables each irrevocably submitted to the exclusive jurisdiction of this Court and the courts of the State of New York in Manhattan, New York.

24.     Accordingly, Plaintiff and Pine Gate Renewables consented to and waived any objection to venue in this Court and/or its jurisdiction over this dispute. Plaintiff and Pine Gate Renewables also consented to and waived any objection to this Court's jurisdiction over each of them.

25.    A forum selection clause may be enforced against a non-signatory to a contract if the non-signatory is closely related to one of the signatories such that enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the non-signatory. *Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 184 A.D.3d 116, 122, 124 N.Y.S.3d 346, 352 (2020).

26.    A non-signatory is closely related if it has an ownership interest or a direct or indirect controlling interest in the signing party, or, the entities consulted with each other regarding decisions and were involved in the decision-making process related to the transaction. *Universal Inv. Advisory SA v. Bakrie Telecom PTE, Ltd.*, 154 A.D.3d 171, 179, 62 N.Y.S.3d 1, 8 (2017)

27.    Pine Gate Development, FP 2021, Sunstone Solar, and the Sunstone Subsidiaries are all closely related to Pine Gate Renewables such that enforcement of the MIPA's forum selection clause is and was foreseeable.

28.    Upon information and belief, Pine Gate Development is a wholly owned subsidiary and/or managed by Pine Gate Renewables.

29.    Upon information and belief, FP 2021 is a wholly owned subsidiary and/or managed by Pine Gate Development.

30.    Upon information and belief, the Sunstone Subsidiaries are each a wholly owned subsidiary and/or managed by FP 2021.

31.    Upon information and belief, the same employees, agents and/or representatives that control Sunstone Solar, Pine Gate Development, FP 2021, and the Sunstone Subsidiaries, negotiated and signed the MIPA on behalf of Pine Gate Renewables.

32.    Upon information and belief, Catt directly or indirectly exercises ultimate decision-making authority on behalf of each of the Defendants.

33.     Therefore, enforcement of the MIPA's forum selection clause against Sunstone Solar, Pine Gate Development, FP 2021, and the Sunstone Subsidiaries is appropriate.

**Factual Background**

34.     Gallatin is a renewable energy development firm headquartered in Bozeman, Montana and has developed wind, solar, and battery energy projects across the country.

35.     Adam Schumaker ("**Schumaker**") is the President of Gallatin Power.

36.     Defendant Pine Gate Renewables is a solar and energy development company headquartered in Asheville, North Carolina.

37.     Ben Catt ("**Catt**") is the Chief Executive Officer of Pine Gate Renewables and, upon information and belief, managed and directed the other Defendants.

38.     This action stems from the Sunstone Solar (formerly referred to as the Echo Solar, Bombing Range Solar I, and Bombing Range Solar II) energy development in Morrow County, Oregon (the "**Project**") – one of the largest U.S. battery solar energy storage project in history. The Project encompasses roughly 10,000 acres and, if completed, will be capable of producing and storing 1.2 GW of electricity – enough to meet the annual needs of roughly 250,000 homes.

39.     Gallatin completed initial development of the Project, securing the relevant land agreements, grid interconnection and transmission rights, and initial permits through an entity formed to hold title to the development rights and relevant assets – Bombing Range Solar I, LLC ("**Bombing Range**").

**MIPA**

40.     In August of 2021, Gallatin sold its membership interest in Bombing Range to Pine Gate Renewables pursuant to the MIPA.

41.     The MIPA defined the "Project" as a "[s]olar system under development sited in Morrow County, Oregon on approximately 3,500 +/- acres and interconnected through Umatilla

Electric Cooperative.," together with the development's "Phase I Capacity" of approximately 440MW of alternating current and 880 MW of direct current capacity and as well as the "Excess Capacity" comprised of an additional Umatilla Electric Cooperative ("**UEC**") Interconnection Application for 810MW of alternating current and 1,620MW of direct current capacity, as well as additional land rights.

42.     Generally, the MIPA provided that Gallatin would sell its 100% interest in Bombing Range to Pine Gate Renewables in exchange for certain cash payments premised upon Pine Gate Renewables' successful completion of the Project.

43.     In exchange for the membership interests and development rights to the Project, the MIPA provided that Gallatin would receive a cash payment of $143,314.34 on the Closing Date to reimburse Gallatin for its development costs and receive the following future payments:

a.     A "Second Payment" payable upon the completion of several conditions precedent (the "**Second Payment Conditions**") including, most critically, the execution of an agreement with an electrical utility provider to purchase power produced by the Project; and

b.     Additional "NTP Payments" payable upon the issuance of Notices to Proceed ("NTPs") by Pine Gate Renewables to an engineering, procurement and construction company to begin construction of the Project. The NTP Payment entitled Gallatin to additional funds based on the total amount of the Project Capacity that began construction.

44.     One of the other critical milestones contemplated by the MIPA was Gallatin's execution of a Transmission Service Agreement with Bonneville Power Administration ("**BPA**") which, in turn, was to be assigned back to Pine Gate Renewables.

45.     Transmission Service Agreements are critical to the Project's success because they allow the Project to connect to the electrical grid and transmit power to a buyer.

46.     In September and October of 2022, in accordance with Section 4.6 of the MIPA, Pine Gate Renewables completed its acquisition of the Excess Capacity assets by submitting Transmission Service Requests for the Excess Capacity into the 2023 BPA TSR Study and Expansion Process.  Gallatin assigned the 810MW Excess Capacity Interconnection Application with UEC and four associated purchase and lease option agreements from Bombing Range Solar II, LLC to Echo Solar, LLC (the "Excess Capacity Assets").  On October 24, 2022, Pine Gate Renewables paid Gallatin $141,048.18 to reimburse it for its documented third party costs associated with the Excess Capacity.

**Creation of Sunstone Solar**

47.     Shortly after closing of the MIPA, Pine Gate Renewables changed the name of Bombing Range Solar I, LLC to Echo Solar, LLC.

48.     On March 16, 2023, Pine Gate Renewables changed the entity name from Echo Solar, LLC, to Sunstone Solar, LLC.

49.     While different in name, Sunstone Solar currently exists as the Project Company described in and underlying the MIPA.

**Gallatin's Repurchase Option and Pine Gate Renewables' Restrictions.**

50.     Critically, the MIPA also included a "Seller Repurchase" option, which granted Gallatin the right to repurchase the Project "[i]n the event [Pine Gate Renewables] discontinues development of the Project or any portion thereof," by, *inter alia*:

a.      discontinuing any development of the Project;

b.      failing to achieve the Second Payment Conditions or make the Second Payment to Gallatin; or

8

c.      failing to make any payment required under a Project contract that could have a materially adverse effect on the Project's success.

51.     The MIPA also restricted Pine Gate Renewables' rights with respect to the assets comprising the Project.

52.     Among other things, the MIPA provided that "the material assets constituting the Project" with respect to its 440MW of Phase I Capacity "shall be held by the Project Company," i.e. Sunstone Solar.

53.     The MIPA also provided that Pine Gate Renewables was prohibited from "tak[ing] any action" that would either "reduce the amount owed to [Gallatin] for the Second Payments or NTP Payments" or "prevent achievement of the Second Payment Conditions Precedent or the Notices to Proceed" affecting the NTP Payments.

54.     The MIPA further prevented Pine Gate Renewables from selling, assigning, or transferring "any portion of the Project or Project Assets, or any Membership Interests . . ." until all NTP Payments had been made and the final project capacity was determined absent certain permitted exceptions.

55.     Applicable here, the MIPA's prohibition on any sale, transfer or assignment prevented Pine Gate Renewables from such a transaction with an affiliated entity unless such entity was "at least as creditworthy" as Pine Gate Renewables.

56.     Even if a permitted sale, transfer, or assignment occurred, however, the MIPA made clear that all payments owed to Gallatin under the MIPA would remain payable.

**First Amendment to the MIPA**

57.     On September 13, 2022, Gallatin and Pine Gate Renewables executed the First Amendment to the MIPA (the "**First Amendment**").

58.    The First Amendment expanded Pine Gate Renewables' obligation with respect to the Project's transmission rights through BPA by requiring Gallatin to execute either a Conditional Firm Service Agreement or Transmission Service Agreement with BPA associated with certain preexisting transmission service requests (the "**AREFs**") and assign the same to Pine Gate Renewables within 60 days of execution of such an agreement along with the transmission service requests underlying the AREFs and any associated agreements. Although the agreements were in Gallatin's name (because they could not yet be assigned to Pine Gate Renewables due to the BPA's processes), Pine Gate Renewables was responsible for all costs associated with the agreement.

59.    The First Amendment also provided that Gallatin was prohibited from executing any further agreements related to the AREFs without Pine Gate Renewables' express written consent.

**First Side Letter to the MIPA**

60.    On October 18, 2022, Gallatin and Pine Gate Renewables executed the First Side Letter to the MIPA.

61.    Through the First Side Letter, the parties acknowledged that Pine Gate Renewables would amend the two pending interconnection and transmission service requests with Umatilla Electric Cooperative ("**UEC**") from two requests for an aggregate of 1,250 MW into six separate requests of 200 MW each.

62.    The First Side Letter made clear that its terms did not negate any terms of the MIPA.

**Second Side Letter to the MIPA**

63.    On August 23, 2023, Gallatin and Pine Gate Renewables executed the Second Side Letter to the MIPA prepared by Pine Gate Renewables.

10

64.     Through the Second Side Letter, Pine Gate Renewables agreed that it and Gallatin "continue[d] to perform under the [MIPA]."

65.     The Second Side Letter modified the definition of Phase I Capacity from 440MW to 400MW and stated that Pine Gate Renewables had modified the UEC Phase I Capacity interconnection and transmission service request from 440MW to 200MW and modified the UEC Excess Capacity interconnection and transmission service request from 810MW to 200MW, and that those modified interconnection and transmission service requests, along with other assets, constituted the Phase I Capacity under the MIPA.

66.     The Second Side Letter also represented that Pine Gate Renewables had submitted four separate 200MW interconnection and transmission service requests with UEC, as agreed in the First Side Letter, for an aggregate total of 800MW which constituted the Excess Capacity described in the MIPA.

67.     The Second Side Letter also acknowledged that Bombing Range Solar II, LLC, a Gallatin-affiliated entity, had assigned certain real estate lease and purchase rights to Echo Solar, LLC, a Pine Gate Renewables-affiliated entity. Through the Second Side Letter, these rights became Excess Capacity Assets under the MIPA.

68.     Finally, the Second Side Letter acknowledged that Gallatin had performed reasonably in performing all Services it agreed to provide under the MIPA.

**Defendants' Breaches of the MIPA**

69.     Only months after closing of the MIPA, Pine Gate Renewables orchestrated the formation of FP 2021, a wholly owned subsidiary of Pine Gate Development which is, in turn, a wholly owned subsidiary of Pine Gate Renewables.

70.     Although the exact timing of the transaction is unknown, Gallatin understands that Pine Gate Renewables subsequently transferred 100% of the membership interests in Sunstone Solar (the Project Company under the MIPA) to FP 2021.

71.     Such transfer violated the MIPA absent proof that FP 2021, a wholly owned subsidiary of Pine Gate Renewables, is "at least as creditworthy" as Pine Gate Renewables as of the August 2021 MIPA closing.

72.     Upon information and belief, FP 2021 was not and is not as creditworthy as Pine Gate Renewables was in August of 2021.

73.     Accordingly, the transfer of Pine Gate Renewables' interest in Sunstone Solar to FP 2021 constitutes a breach of the MIPA.

74.     Even if the transfer to FP 2021 was permissible under the MIPA, the payment obligations imposed by the MIPA and owed to Gallatin remain.

75.     Upon information and belief, Pine Gate Renewables began experiencing financial difficulties in late 2024 or early 2025.

76.     On February 19, 2025, Pine Gate Renewables, acting through FP 2021, formed the six Sunstone Subsidiaries by filing Articles of Organization with the Oregon Secretary of State.

77.     Upon information and belief, the Sunstone Subsidiaries are controlled directly or indirectly by Catt, the CEO of Pine Gate Renewables.

78.     Upon information and belief, the Sunstone Subsidiaries were formed to accomplish the transfer of Project assets away from the Project Company, in violation of the MIPA.

79.     Indeed, public filings with the Oregon Energy Facility Siting Council ("**EFSC**") the entity responsible for issuing the Site Certificate making the Project possible, establish that

Sunstone Solar requested to divide the Project into six 200MW facilities, each of which would hold their Site Certificate issued to one of the Sunstone Subsidiaries.[1]

80.    The ESFC Site Certificate constitutes a material asset of the Project and the transfer of the same constitutes a breach of the MIPA.

81.    Upon information and belief, Pine Gate Renewables plans to transfer or has transferred additional interconnection applications with BPA and/or UEC to Sunstone 1-Sunstone 6.

82.    Such transfer similarly constitutes a breach of the MIPA because the Sunstone Subsidiaries, at the time of the transfer(s), were not as creditworthy as Pine Gate Renewables was as of the closing of the MIPA.

83.    Gallatin had no knowledge of the Sunstone Subsidiaries or FP 2021 until September of 2025.

84.    Concerned Pine Gate Renewables was attempting to avoid its obligations under the MIPA by transferring assets, Gallatin requested an amendment to the MIPA making the Sunstone Subsidiaries "Additional Purchasers" under the MIPA and clarifying that they were jointly and severally liable with Pine Gate Renewables for the payment obligations owed to Gallatin under the MIPA.

85.    Gallatin provided Pine Gate Renewables a draft Second Amendment to the MIPA intended to accomplish this goal.

86.    Pine Gate Renewables represented that the draft Second Amendment was acceptable.

---

[1]  https://www.oregon.gov/energy/facilities-safety/facilities/Facilities%20library/2025-07-24-SSPAMD1-pRFA.pdf, last visited October 23, 2025.

87.    Schumaker, on behalf of Gallatin, also spoke with Catt, acting on behalf of Pine Gate Renewables and the Sunstone Subsidiaries regarding the proposed amendment.

88.    Catt agreed with Schumaker that the Sunstone Subsidiaries should be added as Additional Purchasers under the MIPA and were equally responsible for all payment obligations owed to Gallatin.

89.    Upon information and belief, Pine Gate Renewables' refusal to sign the Second Amendment to the MIPA and explicitly bind the Sunstone Subsidiaries to its terms was designed to reduce or escape liability for the Second Payment and/or NTP Payment owed to Gallatin and constituted a breach of the MIPA.

**Pine Gate Renewables' Insolvency**

90.    In September of 2025, national media began reporting that Pine Gate Renewables was experiencing liquidity issues and considering bankruptcy.[2]

91.    Concerned about Pine Gate Renewables' financial stability and the future of the Project, Gallatin sent Pine Gate Renewables formal notice that it was exercising its Repurchase option under the MIPA on October 17, 2025 (the "**Repurchase Notice**")

92.    The Repurchase Notice explained that Pine Gate Renewables had failed to comply with the MIPA and achieve requisite Project milestones including, *inter alia*:

    a.    Financial inability to enter into a Power Purchase Agreement for the Phase I Capacity; and

    b.    Failure to make certain Project Contract payments that had or would have a materially adverse impact on the Project.

---

[2]    https://news.bloomberglaw.com/environment-and-energy/solar-firm-pine-gate-turns-to-advisers-amid-anti-green-push;https://www.bloomberg.com/news/articles/2025-09-26/solar-firm-pine-gate-preparing-for-potential-bankruptcy-filing

93.     Pursuant to the MIPA and Repurchase Notice, Pine Gate Renewables has until November 1, 2025 to provide its calculation of the Repurchase Price and has until November 16, 2025 to deliver a Membership Interest Purchase Agreement to Gallatin to accomplish the repurchase.

94.     To date, Pine Gate Renewables has given Gallatin no indication it intends to comply with these requirements.

95.     Upon information and belief, Pine Gate Renewables is insolvent and unable to comply with the MIPA or develop and construct the Project.

**The Project is on the Brink of Total Disaster**

96.     Ongoing development of the Project requires significant financial responsibilities in the coming months including:

   a.   $500,000 due on November 1, 2025 pursuant to a Generator Interconnection Agreement ("**GIA**") with UEC;

   b.   Approximately $5 million owed to UEC under additional GIAs;

   c.   Future costs associated with connecting to BPA's power grid in excess of $8 million; and

   d.   Annual payments to landowners under purchase and lease option agreements ranging from $25,000 to $60,000;

97.     If even a single payment to BPA or UEC is missed, the Project will lose its interconnection rights and forced to start the application process anew – one that takes five to ten years, if it can be renegotiated at all.

98.     In addition to the financial obligations associated with continued development of the Project, the Site Certificate requires that construction begin on the first phase of the Project

by November 18, 2027, begin construction of the final phase on or before November 18, 2028, and complete construction of the entire Project on or before November 18, 2030.

99.     A typical construction timeline for a single 200MW project requires 12 months of pre-construction for engineering and procurement and at least 18 months from the start of construction to commercial operation.

100.     The Project is comprised of six 200MW phases, meaning the construction process would take nine years if the phases were built sequentially.

101.     While Pine Gate Renewables planned for the pre-construction and construction of the six phases to overlap to meet this timeline, its insolvency has prevented it from beginning even the procurement process in any meaningful way.

102.     If the Project timeline is delayed any further, it will become increasingly difficult or impossible to complete construction by 2030.

103.     Currently, the Project's location makes it eligible for a 40% federal Investment Tax Credit ("**ITC**").

104.     In order to qualify for the ITC, the Project must begin construction no later than July 4, 2026 and placed into service no later than December 31, 2030.

105.     Without the ITC, the Project and/or any individual phase will no longer be economically viable.

106.     With one of the country's largest solar energy projects hanging in the balance, Gallatin brings this action seeking monetary and equitable relief caused by Defendants' willful, fraudulent, and otherwise unlawful activity.

## COUNT I
**Declaratory Judgment that Gallatin is the Equitable Owner of the Project (all Defendants)**

107.    Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

108.    A justiciable controversy exists between Gallatin and Defendants regarding ownership of the Project in light of the various torts, breaches, and wrongdoing by Defendants described in this Complaint.

109.    Such dispute involves substantial legal rights conferred on the parties under the MIPA.

110.    Gallatin contends that it is entitled to repurchase the Project pursuant to the MIPA and/or declared the equitable owner of the Project.

111.    Upon information and belief, Defendants dispute this contention and are unlikely to permit Gallatin's repurchase of the Project absent judicial intervention.

112.    Accordingly, Gallatin respectfully requests a declaration that is the equitable owner of the Project or entitled to repurchase the Project pursuant to the MIPA.

## COUNT II
**Declaration that the Sunstone Subsidiaries are Jointly and Severally Liable for Pine Gate Renewables' Obligations Under the MIPA**

113.    Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

114.    A justiciable controversy exists between Gallatin and Defendants regarding the extent to which the Sunstone Subsidiaries are jointly and severally liable with Pine Gate Renewables under the MIPA.

115.    Such dispute implicates the substantial legal rights conferred upon the parties under the MIPA.

116.    Gallatin contends that the various transfers of Project assets between Pine Gate Renewables and the Sunstone Subsidiaries imposes joint and several liability upon the Sunstone Subsidiaries for all obligations owed by Pine Gate Renewables to Gallatin under the MIPA.

117.    Upon information and belief, Defendants dispute this contention and deny that the Sunstone Subsidiaries are obligated under the MIPA.

118.    Accordingly, Gallatin respectfully requests a declaration that the Sunstone Subsidiaries are jointly and severally liable for the obligations imposed on Pine Gate Renewables under the MIPA.

## COUNT III
### Breach of Contract (Pine Gate Renewables)

119.    Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

120.    A valid and enforceable contract existed between Gallatin and Pine Gate Renewables in the form of the MIPA.

121.    Gallatin performed all contractual obligations and fulfilled all duties owed to Pine Gate Renewables under the MIPA.

122.    Pine Gate Renewables breached the MIPA by, inter alia, transferring assets to FP 2021 and the Sunstone Subsidiaries in violation of its terms and refusing to honor Gallatin's right repurchase the Project.

123.    Pine Gate Renewables breached the MIPA by refusing to execute the Second Amendment to the MIPA necessary to explicitly bind the Sunstone Subsidiaries to its terms including, most importantly, the payments Gallatin is entitled to under the MIPA.

124.    Pine Gate Renewables, in addition to or in the alternative, anticipatorily breached the MIPA by becoming insolvent such that it cannot continue development of the Project – thereby

18

voluntarily disabling itself from complying with the MIPA's obligations. See *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 77, 747 N.Y.S.2d 468, 475 (2002).

125.    Accordingly, Pine Gate Renewables is liable to Gallatin for all damages caused by its breaches in an amount to be proven at trial.

## COUNT IV
### Breach of Covenant of Good Faith and Fair Dealing

126.    Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

127.    Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance. "[T]he covenant is breached where one party to a contract seeks to prevent its performance, or to withhold its benefits from the other." *Singh v. T-Mobile*, 232 A.D.3d 662, 665, 222 N.Y.S.3d 545, 550 (2024).

128.    The MIPA, as with all contracts governed by New York law, contains an implied covenant of good faith and fair dealing in the course of performance.

129.    Pine Gate Renewables breached the implied covenant as alleged throughout this Complaint including, without limitation, by:

    a.  Transferring assets to FP 2021 and/or the Sunstone Subsidiaries;

    b.  Concealing such transfers from Gallatin;

    c.  Concealing its insolvency from Gallatin;

    d.  Refusing to acknowledge and/or honor Gallatin's demand to repurchase the Project;

    e.  Refusing to add the Sunstone Subsidiaries as Additional Purchasers bound by the MIPA; and

f.   Placing the future viability of the Project at risk without notice or warning of any kind to Gallatin.

130.   Accordingly, Pine Gate Renewables is liable to Gallatin for all damages caused by its breaches in an amount to be proven at trial

**COUNT V**
**Tortious Interference with Contract (Sunstone Solar, Pine Gate Development, Sunstone Subsidiaries and FP 2021)**

131.   Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

132.   A valid contract existed between Gallatin and Pine Gate Renewables in the form of the MIPA.

133.   Sunstone Solar, the Sunstone Subsidiaries, Pine Gate Development, and FP 2021 each had actual knowledge of the MIPA and the obligations it imposed on Pine Gate Renewables in light of their common ownership and management.

134.   Sunstone Solar, FP 2021 and/or the Sunstone Subsidiaries intentionally caused or allowed Pine Gate Renewables' breach of the MIPA by accepting its transfers of assets or ownership interests with knowledge they violated the MIPA and placed the future viability of the Project at risk.

135.   The Sunstone Subsidiaries further intentionally caused or allowed Pine Gate Renewables' breach of the MIPA by refusing to execute the Second Amendment to the MIPA.

136.   Pine Gate Development further intentionally caused or allowed Pine Gate Renewables' breach of the MIPA by directing the tortious interference described above by FP 2021 and the Sunstone Subsidiaries.

137.    Accordingly, Sunstone Solar, Pine Gate Development, FP 2021 and the Sunstone Subsidiaries are liable to Gallatin for all damages caused by their breaches in an amount to be proven at trial.

## COUNT VI
### Fraudulent Transfers (All Defendants)

138.    Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

139.    Gallatin was and is a creditor of Pine Gate Renewables at all times relevant to this Complaint.

140.    Pine Gate Renewables made various transfers to FP 2021 and the Sunstone Subsidiaries as described herein.

141.    Such transfers were accompanied by one or more "badges of fraud" under Debtor and Creditor Law § 273 because, *inter alia*:

    a.    FP 2021 and the Sunstone Subsidiaries were insiders of Pine Gate Renewables;

    b.    Such transfers were not in the ordinary course of business;

    c.    The transfers constituted a substantial portion of Pine Gate Renewables' assets

    d.    The transfers were not disclosed to Gallatin;

    e.    Pine Gate Renewables received inadequate consideration or no consideration on account of the transfers; and

    f.    Pine Gate Renewables was insolvent or became insolvent shortly after the transfers were made.

142.    Pine Gate Renewables made such transfers without receiving reasonably equivalent value in exchange for the transfers.

143.    Alternatively or in addition to the foregoing, Pine Gate Renewables was insolvent at the time of some or all of the transfers, or became insolvent as a result of such transfers.

144.    Pine Gate Renewables was at the time of the transfers or was rendered unable to pay its debts and meet its obligations as they came due, including the obligations to Gallatin.

145.    Alternatively or in addition to the foregoing, Pine Gate Renewables made such transfers with the actual intent to hinder, delay, or defraud Gallatin and prevent it from obtaining the payments it is entitled to under the MIPA.

146.    Accordingly, Gallatin is entitled to one or more of the remedies codified in Debtor and Creditor Laws § 276, including, without limitation, avoidance of the transfers, an attachment against the transferred property, return and recovery of the transferred assets, appointment of a receiver, and/or an injunction against further disposition of the assets by Defendants.

147.    In addition to the foregoing relief, Gallatin is entitled to an award of attorney's fees pursuant to Debtor and Creditor Laws § 276-a.

## COUNT VII
### Alter Ego (Pine Gate Development, Sunstone Solar, Sunstone Subsidiaries and FP 2021)

148.    Gallatin realleges and incorporates the foregoing allegations by reference as though fully set forth herein.

149.    Pine Gate Development, Sunstone Solar, the Sunstone Subsidiaries, and FP 2021 are directly or indirectly wholly owned subsidiaries and/or managed by Pine Gate Renewables.

150.    Pine Gate Renewables completely dominated and directed the actions taken by Pine Gate Development, Sunstone Solar, the Sunstone Subsidiaries, and/or FP 2021 alleged in this Complaint.

151.    Pine Gate Renewables used such domination to commit the torts, fraud, and wrongdoing against Gallatin alleged in this Complaint.

152.    Accordingly, Pine Gate Development, Sunstone Solar, the Sunstone Subsidiaries, and FP 2021 should be declared alter egos of Pine Gate Renewables and deemed jointly and severally liable for any damages awarded to Gallatin.

## PRAYER FOR RELIEF

WHEREFORE, Gallatin prays for judgment against Defendants as follow:

1.    A preliminary injunction and temporary restraining order (1) enjoining Defendants from further encumbering, selling, assigning, or otherwise transferring any rights or interest associated with the Project and (2) mandating that Defendants comply with Gallatin's Repurchase Notice.

2.    A declaration that Gallatin is the equitable owner of the Project and/or allowed to exercise its option to repurchase the same;

3.    A declaration that the Sunstone Subsidiaries are jointly and severally liable for all obligations imposed on Pine Gate Renewables under the MIPA;

4.    An award of damages against Pine Gate Renewables for its breach of the MIPA and the covenant of good faith and fair dealing in an amount to be proven at trial;

5.    An award of damages against Pine Gate Development, the Sunstone Subsidiaries, and FP 2021 for their tortious interference with Pine Gate Renewables' performance under the MIPA;

6.    Avoidance of the fraudulent transfers or attachment of any judgment in favor of Gallatin to the assets transferred;

7.    A determination that Pine Gate Development, Sunstone Solar, the Sunstone Subsidiaries, and FP 2021 are alter egos of Pine Gate Renewables and jointly and severally liable for any award entered in favor of Gallatin;

8.    Attorney's fees and costs of court; and

9.     All such further relief to which Gallatin is entitled to at law and/or in equity.

DATED October 28, 2025.

PARSONS BEHLE & LATIMER

*/s/  Jordan N. Anderson*
Brian M. Rothschild (motion *pro hac vice* forthcoming)
Alissa M. Mellem (motion *pro hac vice* forthcoming)
Jordan N. Anderson (NY Bar No. 5781836)
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
brothschild@parsonsbehle.com
amellem@parsonsbehle.com
janderson@parsonsbehle.com
*Attorneys for Gallatin Power Partners, LLC*